1
2
3
4
5
6
7
8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11   JOSEPH RAYMOND MCCOY,                    )   Case No.: 1:12-cv-000983-AWI-SAB (PC)
                                              )
12                  Plaintiff,                )
                                              )   FINDINGS AND RECOMMENDATIONS
13          v.                                )   REGARDING DEFENDANTS' MOTION FOR
                                              )   SUMMARY JUDGMENT
14   STRONACH, et al.,                        )
                                              )   (ECF No. 267)
15                  Defendants.               )
                                              )
16   _____ )

17          Plaintiff Joseph Raymond McCoy is appearing *pro se* and *in forma pauperis* in this civil rights

18   action pursuant to 42 U.S.C. § 1983.

19          Currently before the Court is Defendants' motion for summary judgment, filed October 21,

20   2020.

21                                          **I.**

22                                  **RELEVANT HISTORY**

23          This action is proceeding against Defendants against Defendants Stronach, Gonzalez,[1] LeMay,

24   Beltran, Fisher, Snell and Tann for deliberate indifference to a serious medical need in violation of the

25   Eighth Amendment.

26

27   _____

28   [1] Incorrectly spelled by Plaintiff as "Gonzales."

                                             1

On June 8, 2020, Plaintiff filed a motion for relief under Rule 8(b)(6) of the Federal Rules of Civil Procedure, arguing that Defendants were required to respond to his specific medical condition when addressing his prior motion for a temporary restraining order.  (ECF No. 228.)  Plaintiff's motion for relief was denied on June 28, 2020.  (ECF No. 237.)

On June 17, 2020, Plaintiff filed a motion requesting the Court appointment an expert witness. (ECF No. 232.)  On June 26, 2020, the Court denied Plaintiff's motion.  (ECF No. 236.)

On July 15, 2020, Plaintiff filed motions for reconsideration of the orders denying him relief under Rule 8(b)(6) and request for appointment of an expert witness.  (ECF Nos. 238, 239.)  The Court denied Plaintiff's motions on October 15, 2020.  (ECF No. 264.)

On July 20, 2020, Plaintiff filed a motion for a temporary restraining order.  (ECF No. 241.) Plaintiff's motion was denied on October 15, 2020.  (ECF No. 263.)

On October 21, 2020, Defendants filed the instant motion for summary judgment.  (ECF No. 267.)

On October 26, 2020, Plaintiff filed a notice of appeal seeking review of the Court's orders denying his motions for reconsideration and his motion for a temporary restraining order.  (ECF No. 269.)

On November 2, 2020, Plaintiff filed a motion for reconsideration of the October 15, 2020, order granting in part Defendants' motion to extend the dispositive motion deadlines. (ECF Nos. 262, 272.) The Court construed Plaintiff's motion as a motion for the District Judge to recuse or disqualify himself from this matter.  (ECF No. 272.)

On November 6, 2020, Plaintiff filed an opposition, and Defendants filed a reply on November 16, 2020.  (ECF Nos. 273, 274.)  On December 3, 2020, Plaintiff filed a sur-reply.[2]  (ECF No. 275.)

---

[2] Parties do not have the right to file surreplies and motions are deemed submitted when the time to reply has expired. Local Rule 230(*l*). The Court generally views motions for leave to file a sur-reply with disfavor. Hill v. England, No. CVF05869 REC TAG, 2005 WL 3031136, at *1 (E.D. Cal. 2005) (citing Fedrick v. Mercedes–Benz USA, LLC, 366 F.Supp.2d 1190, 1197 (N.D. Ga. 2005)). However, district courts have the discretion to either permit or preclude a sur-reply. See U.S. ex rel. Meyer v. Horizon Health Corp., 565 F.3d 1195, 1203 (9th Cir. 2009) (district court did not abuse discretion in refusing to permit "inequitable sur-reply"); JG v. Douglas County School Dist., 552 F.3d 786, 803 n.14 (9th Cir. 2008) (district court did not abuse discretion in denying leave to file sur-reply where it did not consider new evidence in reply); Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) (new evidence in reply may not be considered without giving the non-movant an opportunity to respond).  Although Plaintiff does not have a right to file a sur-reply, in this

On December 16, 2020, the Court of Appeal for the Ninth Circuit denied Plaintiff's appeal for review of the orders denying his motions for reconsideration and his motion for a temporary restraining order finding there was no jurisdiction. (ECF No. 276.)  The mandate issued on January 6, 2021.  (ECF No. 277.)

On January 15, 2021, the Ninth Circuit denied Plaintiff's petition for writ of mandamus.  (ECF No. 278.)

On January 15, 2021, District Judge Anthony W. Ishii denied Plaintiff's motion for recusal or disqualification.  (ECF No. 279.)

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry

---

instance the Court will exercise its discretion and not strike the sur-reply, as it does not change the analysis of Defendants' motion for summary judgment.

of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d at 942 (quotation marks and citation omitted).  It need only draw inferences, however, where there is "evidence in the record...from which a reasonable inference...may be drawn"; the court need not entertain inferences that are unsupported by fact. Celotex Corp. v. Catrett, 477 U.S. 317, 330 n.2 (1986).  But, "if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999) (citation omitted).

In arriving at these Findings and Recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## III.

## DISCUSSION

### A.    Summary of Plaintiff's Complaint

Plaintiff alleges that on June 11, 2009, Defendant Stronach examined Plaintiff and found that he had an infection of his right foot. Plaintiff alleges that she knowingly overstepped the scope of her LVN license by prescribing him two tubes of anti-fungal cream. Defendant Stronach also instructed Plaintiff to return to the general population despite his request to see qualified medical personnel and despite obvious signs of swelling, oozing and difficulty walking.

On June 14, 2009, after following Defendant Stronach's instructions, Plaintiff noticed an increase in swelling, discoloration and drainage, and he had more difficulty walking. Defendant Stronach again refused to provide Plaintiff with access to specialized medical personnel.

///

///

4

Plaintiff went to Fresno Community Hospital where his right foot was placed in a splint and he was given antibiotics.  Plaintiff was in severe pain and was unable to walk.  Medical experts at Fresno Community Hospital instructed Kelso to ensure that he received medical treatment.

On June 25, 2009, Kelso delegated Defendant Doctor Gonzalez and Defendant Stronach to carry out Plaintiff's medical orders.  Plaintiff told Defendants Gonzalez and Stronach that while he was trying to shower, the splint on his right leg became contaminated.  Instead of referring him to medical personnel to replace his splint, and despite observing discharge, pain, swelling and difficulty walking, Defendant Gonzalez instructed Defendant Stronach to remove the splint and issue an Ace Wrap.  Defendant Stronach instructed Plaintiff to place the Ace Wrap on his own foot and when Plaintiff disagreed, Defendants Gonzalez and Stronach ordered Plaintiff to leave the clinic.

On June 30, 2009, Defendant Gonzalez interviewed Plaintiff.  When Plaintiff began to explain his dissatisfaction with his medical treatment, Defendant Gonzalez told Plaintiff that he would order Stronach to ensure that staff under her supervision cleaned the wound every two days for one week.

On August 13, 2009, Kelso delegated Defendants Gonzalez and Stronach to comply with orders for Plaintiff's medical treatment.  Defendant Gonzalez issued a priority ducat authorizing custody staff to make sure Plaintiff attended his medical appointment.  When custody staff told them that the wheelchair that had been issued to Plaintiff by Enenmoh had malfunctioned and he could not make the appointment, Defendants Gonzalez and Stronach filed a report charging Plaintiff with a rules violation for destroying state property.  Rather than give him medical treatment, Defendant Gonzalez had another prisoner retrieve another wheelchair from the clinic and go get Plaintiff.  Plaintiff was accompanied by Defendant LeMay.

When he arrived, Defendants Snell, Gonzalez, LeMay and Stronach told Plaintiff that he was being charged with destruction of state property.  When Plaintiff asked for another wheelchair, Defendant Gonzalez told Plaintiff that he did not need another one.  He instructed Defendants Stronach and LeMay to issue Plaintiff another prisoner's walker.  When Plaintiff refused and told them that both of his feet were now infected and that walking without protective footwear would be dangerous, Defendants Gonzalez, Stronach, Snell and LeMay decided to force Plaintiff to remain in the general population without protective footwear.

On August 25, 2009, Plaintiff asked other prisoners to find a wheelchair so that he could go to the medical clinic.  Plaintiff was in severe pain, with excessive swelling, burning and blood in his urine.  When Plaintiff arrived, Defendants Gonzalez, Stronach and LeMay asked Plaintiff where he got the wheelchair.  Plaintiff told them he got it from another prisoner, and Defendant Gonzalez ordered Defendants Stronach and LeMay to confiscate the wheelchair.  Plaintiff tried to disagree, but Defendant Gonzalez immediately activated his prison emergency alarm.  Defendants Beltran, Fisher, Snell and Tann responded and Plaintiff told them that he could not walk.  However, Defendants Gonzalez, Stronach and LeMay told them to confiscate the borrowed assistive device.

Defendant Gonzalez also told Defendants Beltran, Fisher, Snell and Tann to remove Plaintiff from the medical clinic, and they ordered staff to pick Plaintiff up off a bench and place him on another bench outside.  Plaintiff was given a walker and told to return to his housing unit.  Plaintiff tried to walk, but the pain caused him to pass out.  When he came to, he felt like he was being carried and noticed that Defendants Gonzalez, Stronach and LeMay were standing over him.  Plaintiff passed out again and when he regained consciousness, he told Defendant Gonzalez that he had severe pain in his back, shoulders and head and requested medical assistance.

Instead of referring Plaintiff to a medical expert to provide appropriate treatment, Defendant Gonzalez instructed Defendants Stronach, LeMay, Beltran, Snell, Fisher and Tann to again remove Plaintiff from the clinic.  Custody staff was instructed to assist Gonzalez, Stronach and LeMay in removing Plaintiff.  Plaintiff was lowered to the ground from a gurney and rolled to the pavement. While Defendants Gonzalez, Stronach, LeMay, Beltran, Snell, Fisher and Tann watched, Plaintiff made attempts to remove himself from the heat of the sun by crawling on his hands and knees back to his assigned housing unit.

///

///

///

///

///

///

**B.     Statement of Undisputed Facts[34]**

1.      At the time of the events giving rise to this lawsuit, Gonzalez was a Doctor, Stronach was a Registered Nurse, LeMay was a Licensed Vocational Nurse, Beltran was a Sergeant, Fisher was a Captain, Snell was a Lieutenant, and Tann was an Associate Warden.  (First Am. Compl., ECF No. 17 at ¶ 3.)

2.      Plaintiff was seen by Nurse Zhang on June 11, 2009.  Plaintiff reported a history of burning, itchiness, and soreness of the right foot between the second and third toes that had started on June 4, 2009.  Plaintiff was found to have skin peeling and cracking between his second and third toes on his right foot.  As Plaintiff's history and exam were consistent with the nursing protocol for tinea pedis (athlete's foot), no physician referral was completed and Nurse Zhang ordered tolnaftate cream, a topical antifungal cream.  Nurse Zhang also instructed Plaintiff to return to the clinic if there was no improvement in seven days.  (Declaration of Feinberg (Feinberg Decl.) ¶ 9, ECF No. 267-5; Declaration of Pimentel (Pimentel Decl.), Ex. A, pgs. 1-3.)

3.      Nurse Stronach provided the tolnaftate to Plaintiff on June 11, 2009.  Plaintiff put the tolnaftate on himself when he returned to his cell.  (Pl. Dep. at 28:20-29:22, ECF No. 267-7, Ex. A.)

4.      On June 14, 2009, Plaintiff was seen by another nurse and was found to have swelling and pain in his right foot.  He was referred to Doctor Rahimi.  Doctor Rahimi gave a telephone order that Plaintiff be provided with Ibuprofen for the pain and be seen on the Doctor's line the next day. (Feinberg Decl. ¶ 10; Pimentel Decl., Ex. A, pgs. 4-5.)

5.      Plaintiff was then seen by Nurse Stronach on June 15, 2009.  Stronach found Plaintiff

---

[3] Hereinafter referred to as "UDF."

[4] In opposing Defendants' motion, Plaintiff did not comply Local Rule 260(b). (ECF No. 273.)  Rule 260(b) requires that a party opposing a motion for summary judgment "shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial."  As a result, Defendants' statement of undisputed material facts in support of their motion for summary judgment is accepted except where brought into dispute by Plaintiff's verified complaint. See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (verified complaint may be used as an opposing affidavit if it is based on pleader's personal knowledge of specific facts which are admissible in evidence); Johnson v. Meltzer, 134 F.3d 1393, 1399–1400 (9th Cir. 1998) (same, with respect to verified motions).

had redness, swelling, and warmth in the right foot.  Doctor Gonzalez was then contacted and ordered x-rays, the antibiotic Bactrim for a suspected bacterial infection, and Ibuprofen for the pain.  (Feinberg Decl. ¶ 11; Pimentel Decl, Ex A, p. 6.)

6.       Later that afternoon of June 15, 2009, Plaintiff was seen by Doctor Jean-Pierre.  Plaintiff had a fever with a temperature of 101.9 degrees.  Doctor Jean-Pierre also documented that the right foot was red, grossly swollen, tender, and with pus draining from the webspace of the second and third toes.  Doctor Jean-Pierre's impression was right foot cellulitis with an abscess, and he ordered that Plaintiff be transferred to an outside hospital for evaluation for possible incision and drainage of the right foot and possible initiation of intravenous antibiotics.  (Feinberg Decl. ¶ 11; Pimentel Decl. Ex. A, pgs. 7-8.)

7.       Plaintiff was seen by Doctor Kwon on the evening of June 15, 2009, at the Fresno Community Regional Medical Center.  Doctor Kwon documented that an x-ray showed no obvious fracture.  But, in case of a possible occult fracture, he applied a splint and provided antibiotics for the skin breakdown.  Dr. Kwon also recommended RICE (rest, ice, compression, and elevation) and a follow-up in the prison medical clinic.  (Feinberg Decl. ¶ 11; Pimentel Decl. Ex. A, pgs. 9-10.)

8.       On June 25, 2009, Plaintiff was seen by Nurse Stronach in the clinic and reported that his splint had come off and gotten wet in the shower.

9.       Plaintiff was examined by Doctor Gonzalez on July 17, 2009, for a follow-up on his right foot.  Doctor Gonzalez noted that the right foot wound had decreased in size and that there was granulation tissue present, consistent with healing.  Doctor Gonzalez diagnosed cellulitis, continued the antibiotics and dressing changes, and ordered a follow-up.  (Feinberg Decl. ¶ 13; Pimentel Decl., Ex. A, p. 12.)

10.       Plaintiff was seen by another doctor on July 18, 2009, and it was noted that an x-ray of his right foot was negative or normal.  (Feinberg Decl. ¶ 13; Pimentel Decl., Ex. A, p. 13.)

11.       Plaintiff was again examined by Doctor Gonzalez on July 30, 2009.  Doctor Gonzalez diagnosed a right foot ulcer that was improving and edema.  He directed Plaintiff to continue with dressing changes and to elevate his extremities.  (Feinberg Decl. ¶ 14; Pimentel Decl., Ex. A, p. 14.)

12.       On August 13, 2009, Plaintiff was called three times to be seen in the clinic but did not

show up.  Doctor Gonzalez determined that the wheelchair, which had been issued on a temporary

basis, would be revoked because Plaintiff could ambulate with a walker, which would be beneficial for

his circulation.  (Feinberg Decl. ¶ 17; Pimentel Decl., Ex. A, p. 17; Declaration of Barba (Barba

Decl.), Ex. A, ECF No. 267-4.)

13.     An inmate Adams, claiming to be Plaintiff's caregiver, arrived in the clinic on August

13, 2009, to return Plaintiff's wheelchair because it was broken.  Stronach inspected the wheelchair

and found that the right metal piece that a person would sit on was completely broken in half.

Stronach noted that the wheelchair had been issued on July 27, 2009, in good working condition.

Stronach did not believe that a metal part on a good wheelchair could break in only two weeks if it

was not intentional.  She therefore charged Plaintiff with a rules violation for destruction of state

property.  (Barba Decl., Ex. B.)

14.     On August 25, 2009, Plaintiff refused to be seen at the nurses line by Nurse Stronach

and Licensed Vocational Nurse LeMay.  (Pimentel Decl., Ex. A, pgs. 22-23.)

15.     Plaintiff was examined by Doctor Gonzalez again on August 25, 2009.  Doctor

Gonzalez diagnosed a right foot wound that had improved since Plaintiff's last visit.  He concluded

that Plaintiff was able to walk with the assistance of a walker.  He also diagnosed a toe wound on

Plaintiff's left foot.  Doctor Gonzalez issued an order that Plaintiff's wheelchair could be taken that

day because it was no longer needed and Plaintiff had a walker with wheels.  He ordered that Plaintiff

have a follow up in one week.  He also prescribed Nystatin, an antifungal cream, for the treatment of

Plaintiff's left foot, that the antibiotic Bactrim be continued for another seven days, and that Plaintiff

have another follow-up in one week.  (Feinberg Decl. ¶ 20; Pimentel Decl., Ex. A, pgs. 24, 26-27.)

16.     About thirty minutes after his examination on August 25, 2009, Plaintiff was again seen

by Doctor Gonzalez.  Plaintiff had fallen on the grass while walking with his walker.  Plaintiff did not

cooperate with an examination.  Doctor Gonzalez determined he was neurologically intact and could

return to his cell.  (Feinberg Decl. ¶ 20; Pimentel Decl., Ex. A, p. 25.)

17.     On September 1, 2009, Plaintiff was seen by a Physician Assistant.  It was noted that he

had a history of an ulcer in his right foot, his x-ray of his right foot was negative for osteomyelitis

(infection of the underlying bones)., and that he was complaining of pain in his left foot with discharge

between the toes.  He was referred to a podiatrist for an evaluation.  (Feinberg Decl. ¶ 21; Pimentel Decl., Ex. A, p. 28.)

18.     Plaintiff was seen for a follow-up with Doctor Gonzalez on September 4, 2009, and it was noted that the right foot had a new discharge.  Doctor Gonzalez ordered that the antibiotics be continued and that another x-ray be done to rule out osteomyelitis.  The x-ray was conducted on September 15, 2009, and it found possible osteomyelitis.  Further evaluation with an MRI was recommended.  (Feinberg Decl. ¶ 22; Pimentel Decl., Ex. A, pgs. 29-30.)

19.     Plaintiff had a follow-up on September 23, 2009, and an MRI of the right foot was requested.  He was also started on the oral antifungal Diflucan to treat onychomycosis, or toenail fungus, of the left foot.  (Feinberg Decl. ¶ 23, Pimentel Decl., Ex. A, p. 31.)

20.     On September 24, 2009, Plaintiff had his first appointment in the podiatry clinic.  Doctor Purtz felt there was an ulcer of the right foot, tinea pedis of the left foot, and cellulitis or skin infection of both feet.  Steri-Strips were recommended to be applied to the right foot lesion and the antibiotic Keflex prescribed.  (Feinberg Decl. ¶ 24; Pimentel Decl., Ex. A. p. 34.)

21.     On October 5, 2009, the MRI of Plaintiff's right foot again listed osteomyelitis as suspected, though in a different location than that mentioned in the x-ray.  He was referred for a consultation with orthopedic surgery.  (Feinberg Decl. ¶ 25; Pimentel Decl., Ex. A, p. 35.)

22.     At the podiatry follow-up appointment on October 22, 2009, Doctor Purtz believed Plaintiff had a right foot abrasion with no redness and mild drainage.  Betadine foot soaks were ordered and extrawide shoes.  (Feinberg Decl. ¶ 26; Pimentel Decl., Ex. A, pgs. 36-37.)

23.     Plaintiff was seen for an initial consultation in the orthopedic clinic by Doctor Smith on November 4, 2009.  Doctor Smith noted it was unclear whether or not Plaintiff had osteomyelitis and requested a bone scan to clarify the diagnosis.  (Feinberg Decl. ¶ 27; Pimentel Decl., Ex. A, p. 38.)

24.     Plaintiff had a bone scan on November 20, 2009, and the result was read as suspicious for osteomyelitis of the dorsum of his right foot.  He was referred for consultations with orthopedic surgery and infectious disease.  (Feinberg Decl. ¶ 30; Pimentel Decl., Ex. A, pgs. 42-44.)

///

///

25.     On December 1, 2009, Doctor Patel performed a biopsy of Plaintiff's right ankle. Acute and chronic inflammation were noted but overall the study was felt to be non-diagnostic. Plaintiff was then seen by infectious disease Doctor Raman on December 16, 2009, and Doctor Raman recommended hospitalization for further management.  (Feinberg Decl. ¶ 31; Pimentel Decl., Ex. A, pgs. 45-47.)

26.     Plaintiff was admitted to Mercy Hospital Bakersfield on December 16, 2009.  On December 17, 2009, an MRI of Plaintiff's right ankle reported findings consistent with his earlier biopsy.  While noting that osteomyelitis could not be ruled out, it was "considered less likely." Plaintiff then underwent an open biopsy and tissue diagnosis of his right food with Doctor Chandrasekaran on December 19, 2009.  The results of this biopsy had not returned yet by the time of Plaintiff's discharge from the hospital on December 21, 2009.  The discharge summary documented that blood work performed during hospitalization was suggestive of disseminated coccidiomycosis involving the bones of Plaintiff's right foot.  The doctor recommended treatment for this possibility with the antifungal medication amphotericin B, but Plaintiff refused.  Plaintiff was subsequently released from the hospital back to prison, where he continued to decline antifungal treatment. (Feinberg Decl. ¶ 32; Pimentel Decl., Ex. A, pgs. 48-55.)

27.     On December 29, 2009, Plaintiff was reporting his pain was "a lot better."  The plan was for a follow-up in the infectious disease clinic.  Plaintiff continued to refuse antifungal medications amphotericin B or Diflucan.  (Feinberg Decl. ¶ 33; Pimentel Decl., Ex. A, p. 58.)

28.     By December 30, 2009 cultures obtained from the December 19, 2009 open biopsy showed no growth of any bacteria, acid-fast bacilli (i.e. tuberculosis), or fungus.  (Feinberg Decl. ¶ 34; Pimentel Decl., Ex. A, p. 60.)

29.     At a chronic care follow-up appointment with Doctor Onyeje on February 8, 2010, Plaintiff reported right foot pain but no fevers, and on exam had no swelling of the right foot.  It was noted that none of the cultures of the right foot were positive.  The plan was for follow-up appointments with podiatry and orthopedic surgery.  (Feinberg Decl. ¶ 36; Pimentel Decl., Ex. A, p. 65.)

30.     On February 16, 2010, Plaintiff refused a rescheduled infectious disease consultation

and stated he did not want to be rescheduled.  (Feinberg Decl. ¶ 37; Pimentel Decl., Ex. A, p. 66.)

31.    On February 25, 2010, and again on March 4, 2010, Plaintiff refused follow-up appointments with podiatry.  (Feinberg Decl. ¶ 38; Pimentel Decl., Ex. A, pgs. 68-70.)

32.    On March 25, 2010, Plaintiff refused an orthopedic surgery follow-up appointment. (Feinberg Decl. ¶ 39; Pimentel Decl., Ex. A, p. 72.)

33.    At a chronic care follow-up appointment with Doctor Onyeje on April 27, 2010, Plaintiff's multiple specialty follow-up refusals, and refusal of antifungal treatment, were noted. Plaintiff reported he still had pain in his right foot but refused a physical exam.  Repeat coccidiomycosis testing was ordered.  (Feinberg Decl. ¶ 40; Pimentel Decl., Ex. A, p. 73.)

34.    On May 13, 2010, Plaintiff refused the blood draw for coccidiomycosis testing as ordered by Doctor Onyeje.  (Feinberg Decl. ¶ 41; Pimentel Decl., Ex. A, p. 74.)4

35.    On January 4, 2011, Plaintiff was seen for follow up by Doctor Onyeje, where he again refused an examination or management of his right foot.  (Feinberg Decl. ¶ 32; Pimentel Decl., Ex. A, p. 77.)

36.    On July 19, 2011, Plaintiff was seen for primary care follow-up by Doctor Metts. Plaintiff was requesting orthotic shoes and narcotic pain medication.  Doctor Metts noted "that in the past 1 to 2 years, [Plaintiff] has had multiple refusals to see infectious disease, podiatry, x-rays, yard physicians and nurses, and lab tests.  I explained to the inmate that it is not possible to help him if he does not follow-up with the doctors, nurses and procedures ordered."  Doctor Metts agreed to refer Plaintiff to the narcotic review committee and for orthotic footwear if Plaintiff would have x-rays done of his right foot and ankle.  (Feinberg Decl. ¶ 44; Pimentel Decl., Ex. A, p. 78.)

37.    On December 9, 2011, Doctor Metts documented that Plaintiff refused to see him that day, had refused multiple recent physician appointments, and had refused x-rays of the right foot. (Feinberg Decl. ¶ 45; Pimentel Decl., Ex. A, p. 79.)

38.    On September 12, 2012, Plaintiff was seen by physician assistant Tiggs-Brown.  He was complaining of "right ankle pain x 2 years refusing any procedure or labs or x-ray of right ankle and foot."  Plaintiff stated that he had been seen by infectious disease but refused to be treated for what might be osteomyelitis, and that he had been told his foot pain was associated with disseminated

coccidiomycosis.  Plaintiff was educated on the importance of following up with a work-up and stated he would now go forward with treating right ankle pain.  The plan was to start with x-rays of the right ankle and foot, followed by a referral to podiatry and then to infectious disease if indicated.  (Feinberg Decl. ¶ 46; Pimentel Decl., Ex. A, p. 80.)

39.     Right foot ankle x-rays performed on September 20, 2012, were unremarkable other than a bunion, which would be unrelated to the prior concerns for osteomyelitis.  (Feinberg Decl. ¶ 47; Pimentel Decl., Ex. A, p. 81.)

40.     Plaintiff then had a follow up on October 24, 2012, with Doctor Hashemi.  It was noted that no pathology was found for Plaintiff's complaints of pain and he was offered an anti-inflammatory pain medication to take as needed.  (Feinberg Decl. ¶ 48; Pimentel Decl., Ex. A, p. 82.)

**C.     Analysis of Defendants' Motion**

Defendants argue the undisputed establishes that they appropriately responded to Plaintiff's medical condition and provided him with proper treatment for his right foot.  There is no dispute and Defendants do not argue that Plaintiff's medical conditions were serious.  Therefore, the only issue to decide is whether Defendants were deliberately indifferent to Plaintiff's medical conditions.

In opposing Defendants' motion, Plaintiff does not address the merits of his claims, but rather argues that the motion should be denied because he has filed an interlocutory appeal to the Court of Appeal for the Ninth Circuity.  However, as stated above in section I, the Ninth Circuit denied Plaintiff's appeal on December 15, 2020, and denied his petition for writ of mandamus on January 14, 2021.  (ECF Nos. 276, 278.)  Thus, there is no merit to Plaintiff's contention.  In addition, Plaintiff's sur-reply does not address the merits of his claims or Defendants' motion for summary judgment.[5]

A prisoner's claim of inadequate medical care does not constitute cruel and unusual punishment in violation of the Eighth Amendment unless the mistreatment rises to the level of "deliberate indifference to serious medical needs."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  The two-part test for deliberate indifference requires

---

[5] The Court notes that the Rand notice which accompanied Defendants' motion for summary judgment clearly informed Plaintiff how to properly file an opposition to the motion.  See ECF No. 267-1.

Plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096.  A defendant does not act in a deliberately indifferent manner unless the defendant "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "Deliberate indifference is a high legal standard," Simmons v. Navajo County, Ariz, 609 F.3d 1011, 1019 (9th Cir. 2010); Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm.  Jett, 439 F.3d at 1096.

Negligence or medical malpractice do not rise to the level of deliberate indifference.  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-106).  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995).  Even gross negligence is insufficient to establish deliberate indifference to serious medical needs.  See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).  Additionally, a prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference.  Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

Further, a "difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d at 242, overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082–83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122–23 (9th Cir. 2012) (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).

1.      **Defendant Doctor Gonzalez**

It is undisputed that on June 15, 2009, Plaintiff presented with redness, swelling and warmth, and Doctor Gonzalez ordered x-rays, the antibiotic Bactrim for a suspected bacterial infection, and Ibuprofen for the pain.  (UDF 5.)  When Doctor Gonzalez saw Plaintiff again on both July 17 and 30, 2009, he found that the wound had decreased in size and appeared to be healing.  (UDF 9, 11.)  On August 13, 2009, Doctor Gonzalez determined that Plaintiff no longer needed a wheelchair and could instead use a walker, which would be beneficial for Plaintiff's circulation.  (UDF 12.)  Doctor Gonzalez examined Plaintiff again, twice, on August 25, 2009, and concluded that his foot wound was improving.  (UDF 15, 16.)  He also again determined that a wheelchair was no longer necessary and ordered that it could be taken.  Plaintiff was also again prescribed pain medication and antibiotics.  After Plaintiff claims he fell on his way back to his housing unit, Doctor Gonzalez again examined Plaintiff and found that he was neurologically intact and could safely return to his cell. (UDF 15, 16.)  On September 4, 2009, Plaintiff was again examined by Doctor Gonzalez and it was noted that there was a new discharge on the right foot.  (UDF 18.)  Doctor Gonzalez again ordered antibiotics and an x-ray, which subsequently revealed possible osteomyelitis.  (UDF 18.)

Defendants have submitted the declaration of Doctor Bennett Feinberg, a board certified physician, who reviewed the medical records and Plaintiff's operative complaint.  Based on his review of the relevant information, Doctor Feinberg opines that Defendants were not deliberately indifferent to Plaintiff right foot infection in 2009; rather, "Defendants were rather prompt and attentive to his medical needs."[6]  (Feinberg Decl. ¶ 49.)  More specifically, Doctor Feinberg declares as follows:

> [I]t is my medical opinion that no actions or inactions on the part of the Defendants caused any delay in diagnosis or treatment of Plaintiff's right foot infection.  It remains unclear whether Plaintiff had osteomyelitis in his right foot caused by disseminated coccidiomycosis, or more simply and commonly had skin infections of the right foot initially caused by athlete's foot and later secondarily infected by bacteria, for which Plaintiff received timely and appropriate treatments.  Osteomyelitis was suggested as a possible diagnosis that could not excluded on

---

[6] Doctor Feinberg graduated from the University of California at San Francisco School of Medicine in 1994.  He completed an internship and residency in Internal Medicine at the Baylor College Medicine in Houston, Texas in 1997.  He is board certified in Internal Medicine and has been licensed to practice in the State of California since 1997.  He is a Diplomat of the America Board of Internal Medicine and has more than 20 years of experience in the field of Internal Medicine.  Doctor Feinberg is currently employed by the California Correctional Health Care Services (CCHCS) and serves as the Chief Medical Consultant for the CCHCS Office of Legal Affairs.  (Feinberg Decl. ¶¶ 2-3.)

imaging studies.  As osteomyelitis is a serious infection that can lead to significant adverse outcomes if untreated, the possibility of this diagnosis was pursued further through biopsies.  When the initial CT-guided biopsy was nondiagnostic, Plaintiff was taken to the operating room for open surgical biopsy.  None of the cultures obtained grew out any infectious agents from the bone in question in Plaintiff's right foot.  These included cultures for bacteria, tuberculosis, as well as fungi.  As a coccidioides fungal infection was suggested by blood tests, treatment with antifungal medication was recommended.  Plaintiff declined such treatment, as well as further recommended and scheduled consultations with the orthopedic surgeon, podiatrist and infectious disease specialists, and numerous primary care follow-up appointments.  Plaintiff thus sabotaged his care.  To the extent any delay in diagnosis and treatment of Plaintiff's right foot infection occurred, and/or resultant harm to Plaintiff, the responsibility lies with Plaintiff himself and not with the Defendants.

(Feinberg Decl. ¶ 50.)

Although Plaintiff may have wished for different treatment and disputes the need for a wheelchair, in particular on August 25, 2009, the undisputed evidence presented establishes that Plaintiff was examined, twice, on this day and provided necessary treatment.  Doctor Gonzalez previously determined that the wheelchair, which had been issued on a temporary basis, should be revoked because Plaintiff could ambulate with a walker, which would be beneficial for his circulation.  (UDF 12.)  Doctor Gonzalez determined again on August 25, 2009 that  Plaintiff's wheelchair could be taken that day because it was no longer needed and Plaintiff had a walker with wheels.  (UDF 15.)

While Plaintiff alleges that he fell while using the walker, the fact remains that the undisputed evidence demonstrates that Doctor Gonzalez provided medically acceptable treatment.  Even if Defendant might have prescribed a different course, it was not beyond the pale for him to insist that the Plaintiff promote his circulation by using the assistance of  walker to accelerate the recovery process by walking.  There is no evidence to support a finding that Doctor Gonzalez had the necessary subjective knowledge that providing Plaintiff with a walker instead of a wheelchair would pose a significant risk to his health or safety.  Further, Plaintiff's disagreement with the course of treatment provided by Doctor Gonzalez is insufficient.  See Toguchi, 391 F.3d at 1059-60; Jackson, 90 F.3d at 332.  Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health."  Jackson, 90 F.3d at 332 (citation omitted).  There is no basis to conclude that the treatment

provided by Doctor Gonzalez was medically unacceptable or chosen in conscious disregard of an excessive risk to Plaintiff's health.  Indeed, Doctor Feinberg's expert testimony supports the finding that the conservative course of treatment followed by Doctor Gonzalez was consistent with the community standard of care.  See, e.g., Edmo v. Corizon, Inc., 935 F.3d 757, 786 (9th Cir. 2019) ("[a]ccepted standards of care and practice within the medical community are highly relevant in determining what care is medically acceptable and unacceptable.) (citations omitted).  In sum, in "considering the record, the judgments of prison medical officials, and the views of prudent professionals in the field," the treatment decisions made by Doctor Gonzalez were medically acceptable.  Id.  Accordingly, summary judgment should be granted in favor of Defendant Doctor Gonzalez.

> 2.    Defendant Nurse Stronach

Plaintiff contends that Nurse Stronach was deliberately indifferent to his medical needs on June 11, 2009, by exceeding the scope of her license and prescribing him with anti-fungal creams for his right foot conditions and sending him back to his housing unit in spite of knowing his condition.  However, the undisputed evidence demonstrates that it was actually Nurse Zhang who examined him on June 11, 2009, and determined that he was suffering from apparent athlete's foot, ordered tolnaftate, and instructed him to return in seven days if there was no improvement.  (UDF 2.)  Nurse Stronach was simply the nurse who provided Plaintiff with the tolnaftate ordered by Nurse Zhang after an examination.  (UDF 3.)  As stated above, Dr. Feinberg reviewed Plaintiff's course of treatment and determined that this initial conservative treatment was appropriate.  (Feinberg Decl. ¶¶ 9, 49, 50.)  Furthermore, Plaintiff's medical history and examination were consistent with athlete's foot, and no physician referral was necessary.  (Feinberg Decl. ¶ 9.)

Plaintiff also alleges that, when his condition did not improve, he was seen by Nurse Stronach and she refused him access to specialized care.  However, the undisputed evidence demonstrates that Plaintiff was seen by Nurse Stronach on June 15, 2009, and she contacted Dr. Gonzalez, who gave orders for an x-ray, antibiotics, and pain medication.  (UDF 5.)  Plaintiff was then referred to and seen by another doctor later that same day.  (UDF 6.)

///

17

The medical documentation reflects that on June 25, 2009, Nurse Stronach saw Plaintiff this day, determined the splint was dry, reapplied it to Plaintiff's foot, and wrapped it with an Ace wrap. (Feinberg Decl. ¶ 12; Pimentel Decl. Ex. A, p. 11.)  However, even assuming, as Plaintiff alleges, that on June 25, 2009 Defendant Stronach told him to apply the Ace Wrap to his foot but he refused, such allegation does not demonstrate deliberate indifference.  Simply instructing Plaintiff to apply the Ace Wrap does not raise a reasonable inference of disregarding an excessive risk of harm. Rather, Plaintiff's allegation, at best, amounts to his dissatisfaction or disagreement with the treatment he received by her, which falls short of establishing the requisite deliberate indifference.  Franklin v. State of Oregon, State Welfare Div., 662 F.3d 1337, 1344 (9th Cir. 1981) ("[a] difference of opinion between a prisoner-patient and prison medical authorities" does not rise to the level of a constitutional violation.).

Plaintiff further alleges that Nurse Stronach charged him with a  rule violation on August 13, 2009, for destruction of state property rather than giving him medical treatment.  However, the undisputed evidence demonstrates that Plaintiff was summoned repeatedly to the medical clinic that day but did not show up.  (UDF 12.)  When another inmate arrived to turn in Plaintiff's wheelchair, it was found that the wheelchair, which had been in good working condition only two weeks earlier, was no broken.  (UDF 13.)  Lastly, Plaintiff contends that Nurse Stronach wrongly saw that a wheelchair he had borrowed on August 25, 2009, was confiscated.  However, the undisputed evidence demonstrates that Doctor Gonzalez properly determined, on both August 13, 2009 and again on August 25, 2009, that a wheelchair was not medically necessary and it should be taken and that it was appropriate for Plaintiff to return to his cell with a walker.  (UDF 12, 15.)  As previously stated, Doctor Feinberg reviewed the treatment provided to Plaintiff and determined it was appropriate at all times and was consistent with community standards of medical care.  (Feinberg Decl. ¶¶ 49, 50.)  Accordingly, summary judgment should be entered in favor of Defendant Nurse Stronach.

### 3. Defendant Licensed Vocational Nurse LeMay

With regard to Defendant LeMay, Plaintiff contends that Lemay was involved in the decision to take his wheelchair on August 13, 2009, and again on August 25, 2009.  However, the undisputed evidence demonstrates that it was Doctor Gonzalez who determined that a wheelchair was no longer

18

necessary and that Plaintiff should use a walker.  (UDF 12, 15.)  Even if LeMay took Plaintiff's wheelchair, it was pursuant to Doctor Gonzalez's order and therefore does not constitute deliberate indifference.  On this record, the Court cannot conclude that the actions of a Licensed Vocational Nurse operating in compliance with a doctor's order could rise to the level of deliberate indifference under this rule.  C.f. Wakefield v. Thompson, 177 F.3d 1160, 1165 (9th Cir.1999) (following Estelle, we have held that a prison official acts with deliberate indifference when he ignores the instructions of the prisoner's treating physician or surgeon).  Thus, given that Defendant LeMay was simply following Defendant Doctor Gonzalez's order (which as explained above was reasonable under the applicable standard of care), it is not possible to conclude that LeMay possessed a culpable state of mind constituting deliberate indifference.  Accordingly, summary judgment should be granted in favor of Defendant LeMay.

4.      Defendants Correctional Staff Beltran, Fisher, Snell and Tran

It is undisputed that Defendants Beltran, Fisher, Snell and Tran were members of the correctional staff, and not part of the medical personnel.  Plaintiff alleges that, on August 13, 2009, Snell permitted him to remain in the general population in spite of his foot infection.  However, there is no evidence that a determination had been made by Plaintiff's medical providers which required that Plaintiff be housed somewhere else due to his medical condition, and Defendant Snell could not have been deliberately indifferent to an excessive risk of harm to Plaintiff's health and safety.[7]

Plaintiff further alleges that Defendants Beltran, Fisher, Snell and Tann removed him from the medical clinic and instructed him to return to his housing unit on August 25, 2009, in spite of his pain and requests for medical assistance.  However, it is undisputed, that Plaintiff had been seen by Doctor Gonzalez, twice, on that day and it was determined that he did not require a wheelchair, that he should use a walker, that his right foot condition was improving, and that he was neurologically intact and

---

[7] When resolving an Eighth Amendment claim against individual defendants, causation must be resolved via "a very individualized approach which accounts for the duties, discretion, and means of each defendant."  Leer v. Murphy, 844 F.2d 628, 633-34 (9th Cir. 1988) (citing with approval Williams v. Bennett, 689 F.2d 1370, 1384 (11th Cir. 1982) ("There can be no duty, the breach of which is actionable, to do that which is beyond the power, authority, or means of the charged party.  One may be callously indifferent to the fate of prisoners and yet not be liable for their injuries.  Those whose callous indifference results in liability are those under a duty – possessed of authority and means – to prevent the injury.")

could return to his cell.  Therefore, it would have been inappropriate for these Defendants as members of the custody staff to attempt to provide Plaintiff with medical care that his doctor did not determine was necessary or appropriate.  See <u>Greeno v. Daley</u>, 414 F.3d 645, 656  (7th Cir. 2005) (citing <u>Spruill v. Gillis</u>, 372 F.3d 218, 236 (3d Cir. 2004) (non-physician defendants cannot "be considered deliberately indifferent simply because they failed to respond directly to the medical complaint of a prisoner who was already being treated by the prison doctor" and if "a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."); <u>see also</u> <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 69 (3d Cir. 1993) (dismissing two non-medical prison personnel because "neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor).  Plaintiff has failed to put forth sufficient evidence to show that Defendants Beltran, Fisher, Snell and Tann acted with deliberate indifference.  In sum, these Defendants cannot be considered deliberately indifferent where they deferred to the assessment of Plaintiff's treating physician.  Accordingly, summary judgment should be granted in favor of Defendants Beltran, Fisher, Snell and Tann.

**IV.**

**RECOMMENDATIONS**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.       Defendants' motion for summary judgment filed on October 21, 2020, be granted; and

2.       Judgment be entered in favor of Defendants.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **twenty-one (21) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the

///

///

///

specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **February 3, 2021**

UNITED STATES MAGISTRATE JUDGE

21